No. 86-430

IN THE SUPREME COURT OF THE STATE OF MONTANA

1990

THE FEDERAL LAND BANK OF SPOKANE, a corporation,

       Plaintiff and Petitioner,

  -vs-

TEXACO, INC., a corporation,

       Defendant and Respondent.



ORIGINAL PROCEEDING:

COUNSEL OF RECORD:

       For Petitioner:

           W. H. Bellingham argued; Moulton, Bellingham, Longo
           & Mather, Billings, Montana.

       For Respondent:

           Raymond K. Peete argued, Attorney at Law, Billings,
           Montana.

Submitted: September 18, 1991

Decided: November 14, 1991

Filed:

Clerk

Justice R. C. McDonough delivered the Opinion of the Court.

This matter is before us on certification from the United States District Court for the District of Montana, Billings Division. We accepted certification pursuant to Rule 44 of the M.R.App.P.

Plaintiff-petitioners, Federal Land Bank (FLB), are lessors and defendant-respondent, Texaco, is lessee under an oil and gas lease. FLB brought suit in the United States District Court of Montana to terminate the lease as to all land not producing oil and gas upon expiration of the 5-year primary term under the lease. Texaco maintains the lease is in effect for all the lands under the lease due to the production of FLB No. 1 oil and gas well. The parties disagree as to the effect of the Pugh clause, paragraph 23, on the Habendum clause, paragraph 5, in the lease. We conclude the Habendum clause is modified by the Pugh clause.

On December 18, 1973, FLB leased the land to Ray Kemmis for the purpose of drilling for oil and gas. Kemmis assigned the lease to Texaco. The lease, which contained a five-year primary term, expired on December 18, 1978.

Texaco completed FLB well No. 1 on February 4, 1978. The well is located at the NE¼SE¼ of Section 7-T22N-R6OE.

The Oil and Gas Conservation Board of the Department of Natural Resources and Conservation for the State of Montana (the Board) is the agency charged with regulating matters pertaining to drilling of oil and gas for the State of Montana. Section 82-11-111, MCA. The Board named all of the leased lands in question the

Mon Dak West Field (The Field). The Field contains several sections of land totalling 1,580 acres. In attempting to determine how wells should be spaced on this acreage, the Board initially determined 320 acre spacing per well.

Section 82-11-201, MCA, provides in part: "To prevent or assist in preventing waste of oil or gas prohibited by this chapter, the board, upon its own motion or upon application of an interested person, after hearing, may by order establish well spacing units for a pool as to oil wells or as to gas wells or both..." The Board issued its spacing requirements for a period of one year, after which permanent spacing of the producing well was to be sought by the operator of the well. Texaco never applied for a permanent spacing order. On May 26, 1977, August 18, 1977, and May 12, 1978 the Board issued orders spacing the units in question. On June 7, 1978 the Board conducted a hearing and issued an Advisory Opinion. Certain members of the Board made a motion for spacing to be changed to one well per 160 acres, but the motion failed. The spacing of wells, upon failure of the motion, reverted to "state-wide" spacing; one well per 320 acres. Administrative Rules of Montana 36.22.701, et sec.

The spacing per 320 acre drilling unit of the field is important here because it is pivotal to the understanding of the disputed clauses included in the lease. The Habendum clause reads as follows:

> It is agreed that this lease shall remain in force for a term of 5 years from this date, and as long thereafter as oil, gas, casinghead gas, casinghead gasoline or any of them is produced from said leased

3

premises, or drilling operations are continued as hereinafter provided. If, at the expiration of the primary term of this lease, oil or gas is not being produced on the leased premises but lessee is then engaged in drilling operations, then this lease shall continue in force so long as drilling operations are being continuously prosecuted on the leased premises; and drilling operations shall be considered to be continuously prosecuted if not more than sixty days shall elapse between the completion or abandonment of one well and the beginning of operations for the drilling of a subsequent well. If oil or gas shall be discovered and produced from any such well or wells drilled or being drilled at or after the expiration of the primary term of this lease, this lease shall continue in force so long as oil or gas shall be produced from the leased premises.

The Habendum clause sets the term of the lease. The Habendum clause in the FLB lease provides the lessee can extend the five year term by producing oil and gas <u>from said leased premises</u> and in addition can be extended past the five year term by the continuous drilling clause. Also, the lease could be extended during the five year term by payment of yearly delay rental. Texaco paid FLB the delay rental fee on December 18, 1977, to continue the lease for another year. FLB No. 1 well has been producing since February 4, 1978.

Paragraph 23 of the FLB lease known as the Pugh clause reads as follows:

23. Should any of the lands hereunder be included in a unit or units, during the primary term, either by written consent of the lessor or as the result of action by any duly authorized authority having jurisdiction thereof, then operations on or production from a well situated on lands embraced in such unit, shall serve to maintain this lease in force as to that portion of the leased premises embraced in such a unit, but shall not so maintain the lease on the remainder of the leased premises not embraced in such a unit and not otherwise maintained under the terms hereof beyond the next rental paying date, unless on or before such rental date lessee shall pay or tender to lessor, or to lessor's credit in

4

the manner provided in this lease, the amount of rental provided herein to be paid upon the area then covered hereby, reduced in the proportion that the acreage covered by this lease and contained in such unit or units bears to the total acreage then covered by this lease and further reduced by the amount of any shut-in gas well royalty payments made by lessee during the rental period or portion thereof immediately preceding such rental payment date on that portion of the leased premises not embraced in such a unit. By similar tender or payments on each succeeding annual rental date this lease may be so maintained in force during the remainder of the primary term as to the portion thereof not included in such unit or units.

The main purpose of a Pugh clause is to "segregate the lands under the lease outside the unit from lands included in the unit for purposes of payment of delay rentals or perpetration by unit production or both." Hemingway, Oil and Gas, 464-465 3rd edition (1991). The Pugh clause may therefore, modify a Habendum (or term) clause to the extent that the lease terminates as to all of the lands included therein with the exception of a unit containing a producing well. In construing an oil and gas lease courts will apply the rules of contract interpretation. We have previously stated:

> [T]he intention of the parties is to be pursued if possible. This intention is to be gathered from the entire agreement, not from particular words or phrases or disjointed or particular parts of it . . . The contract must be viewed from beginning to end, and all its terms must pass in review; for one clause may modify, limit or illuminate the other.

Lee v. Lee Gold Mining Co., et al. (1924), 71 Mont. 592, 599, 230 P. 1091, 1093. Further we stated:

> [I]t is well established that a court, in interpreting a written instrument, will not isolate certain phrases of that instrument in order to garner the intent of the parties, but will grasp the instrument by its four corners and in light of the entire instrument, ascertain

5

the paramount and guiding intention of the parties. Steen v. Rustad (1957), 132 Mont. 96, 102, 313 P.2d 1014, 1018. In Riis v. Day (1980), 188 Mont. 253, 257, 613 P.2d 696, 698, we said:

> A contract is to be construed so as to make provisions effective, if possible. Repugnant provisions should be interpreted in such a way as will give them some effect, subordinate to the general intent and purpose of the entire contract. Sections 28-3-201, 28-3-202, and 28-3-204, MCA. Followed in St. Paul Fire & Marine Ins. Co. v. Cumiskey (1983), 204 Mont. 350, 363, 665 P.2d 223, 229. See also Daniels v. Thomas, Dean & Hoskins (1990), 246 Mont. 125, 145, 804 P.2d 359, 371.

For our purposes the pertinent part of the Habendum clause provides:

> It is agreed that this lease shall remain in force for a term of five years from this date, and as long thereafter as oil, gas, casinghead gas, casinghead gasoline or any of them is produced from said leased premises, or drilling operations are continued as hereinafter provided.

Without more, inasmuch as FLB No. 1 well began producing during the five-year primary period, the lease would remain in effect as to the entire leased premises. However, the pertinent part of the Pugh clause provides:

> Should any of the lands hereunder be included in a unit or units, during the primary term, either by written consent of the lessor or as a result of action by any duly authorized authority having jurisdiction thereof, then operations on or production from a well situated on lands embraced in such unit, shall serve to maintain this lease in force as to that portion of the leased premises embraced in such a unit, <u>but shall not so maintain the lease or the remainder of the leased premises not embraced in such a unit</u> . . . (Emphasis added.)

Here the Pugh clause modifies the Habendum clause. Therefore, the two clauses are not in conflict with one another. Reading both

paragraphs together, and the lease as a whole, their meaning is clear. The Pugh clause does just what it provides; it terminates the lease as to lands not embraced in a producing oil and gas unit. The main purpose of the Habendum clause is to:

> . . . describe the duration of the interest granted, <u>subject to other provisions contained in the lease</u> (emphasis added) which may provide for an earlier or later termination under prescribed circumstances or upon the happening of certain events. 2 Kuntz, <u>Law of Oil and Gas</u>, §§ 26.1, p. 318, (1989).

The Pugh clause here is another provision contained in the lease.

Texaco maintains that the S½ of Section 7 where the well is located has not been established as a unit and therefore the Pugh clause does not apply. We disagree. To determine whether the Pugh clause applies in this instance, it is necessary to set forth some factual background. The producing well Texaco completed in February of 1978 extracts oil and gas from the Red River, Stony Mountain, Mission Canyon and Radcliff formations. The Red River and Stony Mountain formations are part of the Ordovician geological time period and the Mission Canyon and Radcliff formations are part of what has been termed the Madison group, which is part of the Mississippian geological time period. Texaco argues that the result of the June 7, 1978 hearing before the Board reverting the Mon Dak West Field to statewide spacing, did not have an effect on the Red River Formation. It did have an effect, however, because prior thereto, on May 15, 1978, Texaco requested and was given permission to comingle the production from these two zones. The Advisory Notice from the June 1978 hearing, refers to the Madison and Devonian Formations.

7

On May 26, 1977, the Board spaced the Madison and Devonian formations (which include Mission Canyon and Radcliff) for a period of one year upon 320 acre drilling and spacing units. On May 12, 1978, the Board continued this order until July 1, 1979.

On August 18, 1977, the Board spaced the Silurian and Ordovician formations (which include Red River and Stony Mountain) upon 320 acre drilling and spacing units.

FLB maintains that even though the Board used different nomenclature than the specific four formations from which production was eventually obtained, that the four producing formations are included in terms used in the various Board orders.

Further, FLB argues that Texaco in filing a Notice of Intention to Drill with the Board, indicated that the land was located in the Mon Dak West Field. And, Texaco specifically designated the S½ Sec. 7 as a 320 acre spacing unit. The Board approved the application. FLB further argues that both Texaco's and FLB's division orders covered the S½ of Section 7-22N-60E only and Texaco paid royalties under the division order, which further indicates the tract was a properly spaced unit.

We agree that the Board's orders established well spacing units for the field in question. We also hold that the lands covered in the lease were included in a unit. Based on the above discussion, we answer the certified questions separately.

The following questions were certified:

1. Is the term provision of the basic lease as set forth verbatim in paragraph 5 in conflict with paragraph 23 of the basic lease, and if so, what is the legal effect of such conflict? No, as stated above, the Pugh

8

clause modifies the Habendum clause.

2. Are paragraphs 5 and 23 of the basic lease referred to in the foregoing paragraph so indefinite, uncertain and ambiguous that they are incapable of being interpreted? No.

3. Under the facts of this case, have any of the lands covered by the basic lease been "included in a unit or units" as set forth in paragraph 23 of the basic lease and if so, what is the legal effect of such inclusion? Yes, as stated above, the inclusion of the land in a unit triggered the Pugh clause.

4. Under the facts of this case, do the provisions of paragraph 23 of the basic lease operate to terminate and cancel the lease as to all of the lands included therein with the exception of those lands located in Section 7-22N-60E? Yes.

5. Have any formations in the Mon Dak West Field been spaced under the applicable Montana statutes, rules and regulations by Orders numbered 23-77, 42-77, 33-78 and 51-79 and Advisory Notice dated June 8, 1979, of the Montana Board of Oil and Gas Conservation? Yes.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____

_____

_____
Justices