**In re MSR EXPLORATION, LTD., a corporation, MSR Exploration, Inc., a corporation, Gypsy Highview Gathering System, Inc., a corporation, Mountain States Resources, Inc., a corporation, Monte Grande Exploration, Inc., a corporation, MSR Drilling, Inc., a corporation, Debtors.**

**Bankruptcy Nos. 92–40176–11 to 92–40181–11.**

United States Bankruptcy Court, D. Montana.

Nov. 9, 1992.

Joel E. Guthals, Jeffery A. Hunnes, Wright, Tolliver and Guthals, P.C., Billings, Mont., for debtors.

Steven M. Johnson, Great Falls, Mont., for Fina.

Gregory G. Murphy, Billings, Mont., for Meridian.

Blackleaf was not represented by counsel.

## ORDER

JOHN L. PETERSON, Bankruptcy Judge.

In this Chapter 11 case, hearing was held on November 4, 1992, on objections of the Debtor, Gypsy Highview Gathering System, Inc., to the Proofs of Claim filed by Fina Oil & Chemical Co. (Fina), Meridian Oil, Inc., (Meridian), and Blackleaf Partners/Blackleaf Gas Associates (Blackleaf). With the exception of one claim of Blackleaf for $35,724.30 [1], each of the objections by the Debtor center on a common set of facts dealing with sale of natural gas by Fina, Meridian, and Blackleaf (as successors-in-interest) to the Debtor, and Debtor's alleged underpayment of the delivered quantities. Except for Blackleaf, each party was represented by their respective counsel of record. Blackleaf did not participate in the hearing after its request for continuance was denied, but an officer representing Blackleaf was present and testified at hearing. The hearing having concluded, and memoranda of authorities having been submitted by the Debtor and Meridian, the Court deems the matter ripe for decision.

At the hearing, Fina, Meridian and Debtor submitted the following stipulation regarding the objections to the claims:

1. Gypsy Highview Gathering System, Inc. ("GHGS") entered into a "Gas Purchase Contract," dated October 20, 1982, with Superior Oil Company ("Superior"), Williams Exploration Company ("Williams") and Milestone Petroleum, Inc., which later became known as Meridian, under which GHGS agreed to purchase natural gas produced from the Blackleaf Unit in Teton County, Montana, for processing through one of GHGS' gas processing plants. Superior, Williams and Meridian were the working interest holders in the Blackleaf Unit at that time.

2. To memorialize their agreement, the parties executed two documents in counterparts: a Gas Purchase Contract,

---

**1.** Debtor's objection to such claim will be addressed by separate order.

dated October 20, 1982, and a contemporaneous letter agreement amending said Gas Purchase Contract.

3. During the early phases of the sale of gas to GHGS under the terms of the Gas Purchase Contract and Letter Agreement, Superior served as operator for the Blackleaf Unit. Superior continued to serve as operator until it was acquired by Mobil Oil Corporation ("Mobil") in September of 1984. Thereafter, Superior served as operator, as a division of Mobil, until Superior was merged into Mobil in 1985. Thereafter, Mobil served as operator for the unit until Mobil sold its interest in the Blackleaf Unit to EPS Resources Company ("EPS") in December of 1987. EPS has served as operator of the unit since that time.

4. At all times relevant to this contested matter, Meridian has owned and held a twenty-five percent (25%) working interest in the Blackleaf Unit. Fina acquired a twelve and one-half percent (12.5%) working interest in the Blackleaf Unit from Williams under the terms of an "Agreement for Purchase and Sale," dated November 26, 1986. Neither Meridian nor Fina has ever served as operator for the unit.

5. From November of 1984 through December 31, 1991, GHGS took the following volumes, and paid the following prices and total dollar amounts, for gas from the Blackleaf Unit:

| Year | Month | Volume (Mcf) | Price/Mcf | Total Amt. Pd. |
|------|-------|--------------|-----------|----------------|
| 1984 | November | 171,523 | $1.50 | $257,284.50 |
|      | December | 180,570 | 1.50 | 270,855.00 |
| 1985 | January | 174,713 | 1.40 | 244,598.20 |
|      | February | 151,816 | 1.40 | 212,542.40 |
|      | March | 164,640 | 1.40 | 230,496.00 |
|      | April | 153,994 | 1.40 | 215,591.60 |
|      | May | 155,252 | 1.40 | 217,352.80 |
|      | June | 144,574 | 1.40 | 202,403.60 |
|      | July | 61,810 | 1.40 | 86,534.00 |
|      | August | 110,017 | 1.40 | 154,023.80 |
|      | September | 113,689 | 1.40 | 159,164.60 |
|      | October | 73,692 | 1.40 | 103,168.80 |
|      | November | 94,999 | 1.40 | 132,988.60 |
|      | December | 82,550 | 1.40 | 115,570.00 |
| 1986 | January | 67,215 | 1.325 | 89,059.88 |
|      | February | 111,554 | 1.325 | 147,809.05 |
|      | March | 67,934 | 1.325 | 90,012.55 |
|      |  | 34,354 | .90 | 30,918.60 |
|      | April | 120,312 | .90 | 108,280.80 |
|      | May | 115,258 | .90 | 103,732.20 |
|      | June | 96,013 | .90 | 86,411.70 |
|      | July | 33,700 | .90 | 30,330.00 |
|      | August | 13,021 | .90 | 11,718.90 |
|      | September | 87,852 | .90 | 79,066.80 |
|      | October | 76,610 | .90 | 68,949.00 |
|      | November | 48,463 | .90 | 43,616.70 |
|      | December | 48,218 | .90 | 43,396.20 |
| 1987 | January | 38,360 | .90 | 34,524.00 |
|      | February | –0– |  |  |
|      | March | –0– |  |  |
|      | April | –0– |  |  |
|      | May | –0– |  |  |
|      | June | –0– |  |  |
|      | July | –0– |  |  |
|      | August | –0– |  |  |
|      | September | –0– |  |  |

| Year | Month | Volume (Mcf) | Price/Mcf | Total Amt. Pd. |
|------|-------|--------------|-----------|----------------|
|      | October | -0- |  |  |
|      | November | -0- |  |  |
|      | December | -0- |  |  |
|      |  |  |  |  |
| 1988 | January | -0- |  |  |
|      | February | -0- |  |  |
|      | March | -0- |  |  |
|      | April | -0- |  |  |
|      | May | -0- |  |  |
|      | June | -0- |  |  |
|      | July | -0- |  |  |
|      | August | 67,153 | .95 | 63,795.35 |
|      | September | 69,403 | .95 | 65,932.85 |
|      | October | 53,333 | .90 | 47,999.70 |
|      | November | 49,579 | .90 | 44,621.10 |
|      | December | 39,951 | .90 | 35,955.90 |
|      |  |  |  |  |
| 1989 | January | 19,452 | .90 | 17,506.32 |
|      | February | 2,731 | .90 | 2,457.90 |
|      | March | -0- |  |  |
|      | April | 29,599 | .90 | 14,639.10 ** |
|      | May | -0- |  |  |
|      | June | -0- |  |  |
|      | July | 22,593 | .90 | 20,333.70 |
|      | August | 50,829 | .90 | 45,746.10 |
|      | September | 14,738 | .80 | 11,790.40 |
|      | October | 30,190 | .80 | 24,152.00 |
|      | November | 11,262 | .75 | 8,466.50 |
|      | December | -0- |  |  |
|      |  |  |  |  |
| 1990 | January | 16,563 | .80 | 13,250.40 |
|      | February | 8,945 | .75 | 6,708.75 |
|      | March | -0- |  |  |
|      | April | -0- |  |  |
|      | May | 13,470 | .95 | 12,796.50 |
|      | June | 15,909 | .95 | 15,113.55 |
|      | July | -0- |  |  |
|      | August | -0- |  |  |
|      | September | -0- |  |  |
|      | October | -0- |  |  |
|      | November | 34,792 | .95 | 33,052.40 |
|      | December | 62,632 | .95 | 59,500.40 |
|      |  |  |  |  |
| 1991 | January | 61,258 | .95 | 58,195.10 |
|      | February | 42,985 | .90 | 38,686.50 |
|      | March | 35,112 | .80 | 28,089.60 |
|      | April | 20,615 | .75 | 15,461.25 |
|      | May | 15,296 | .75 | 11,472.00 |
|      | June | -0- |  |  |
|      | July | -0- |  |  |
|      | August | 13,053 | .75 | 9,689.75 |
|      | September | 12,825 | .75 | 9,618.75 |
|      | October | 5,035 | .75 | 3,776.25 |
|      | November | -0- |  |  |
|      | December | -0- |  |  |

** GHGS deducted a $12,000 sum for low volume at the rate of $1,500.00 per day.

For purposes of this Stipulation only, Meridian and Fina agree that GHGS paid for gas received on a monthly basis in the ordinary course of business and there is no issue between the parties as to the timeliness of GHGS' payments.

6. Fina has filed two Proofs of Claim, each dated July 13, 1992, as shown on the claims docket, each asserting an unsecured claim in the amount of $293,-196.20. The claims docket reflects that one Proof of Claim was filed on July 14, 1992, and the other was filed on July 15, 1992. Those two Proofs of Claim are inadvertently duplicative, two Proofs of Claim having been sent by Fina's agent to the Clerk of the Bankruptcy Court by two different means of delivery. Fina asserts an aggregate unsecured claim of $293,196.20 (inclusive of interest to the date of filing of the Debtors' Chapter 11 petitions on February 7, 1992) against the bankruptcy estate of Gypsy High-view Gathering System, Inc., based upon delivery of natural gas to that Debtor from the Blackleaf Unit from November 1, 1984, through February 28, 1987.

This case presents two separate phases of gas purchases. Phase one involves a period from November 1984 to January 1987. Phase two involves the time frame from August, 1988 to October, 1991.

Pertinent to the issues in phase one as to alleged underpayment under Article VIII, are paragraphs 8.1 and 8.3 governing price of the gas sold and providing as follows:

8.1 As full consideration for the gas and all components thereof purchased by Buyer hereunder, Buyer shall pay Seller for all gas delivered hereunder $1.75 per thousand standard cubic fee (MSCF) for specification gas (as per Articles II and V) after pay-out of the new capital equipment (equipment, installation, and financing costs) and $1.25/MSCF until pay-out.

\*       \*       \*       \*       \*       \*

8.3 In the event all or a portion of the gas covered by this contract is or becomes deregulated during the term hereon prior to the time of renegotiation, or by January 1, 1985, at latest, Buyer agrees to pay Seller Fifty percent (50%) of any increase in price Buyer receives pursuant to the terms of Buyer's resale contract, provided that any increases through deregulation does not cover increases for severance taxes adjustments and/or credits allowed for processing and compression. Conversely that, if by deregulation, the base price decreases it shall be recognized that Buyer at all times will be entitled to a minimum of $0.55 per Mcf of purchased gas for compression and gas processing (sweetening, refrigeration, transportation, etc.). The Seller, under conditions of lower prices than in paragraph 8.1 has the right to not supply gas if it is unprofitable to him.

The evidence shows that all of the original parties to the gas supply agreement were aware of two basic facts. One, GHGS had a sole source sales agreement for the processed gas with the Montana Power Company under a 1977 contract. Two, the parties recognized that at the time of the execution of the agreements, the U.S. Government would "deregulate" natural gas pricing effective January 1, 1985. It is further clear from the uncontradicted evidence, that U.S. deregulation of the natural gas market directly impacted the sales price of natural gas from Canada because the two markets are interconnected. The Montana Power Company purchased gas from Canada, and that price was dictated by a Canadian regulatory agency. The importance of such market impact from U.S. deregulation is shown by Debtor's exhibit of a letter from Montana Power notifying GHGS that a change in Canadian Border price just prior to January 1, 1985, changed the price Montana Power would pay GHGS beginning in November, 1984. GHGS wrote each seller on November 26, 1984:

In the meantime, it looks like we have not had to wait for deregulation to see new prices from Montana Power Co. As you know, MPC has made application to the National Energy Board in Ottawa in an attempt to establish new Montana

prices, based on imported Alberta gas. Needless to say, we are contesting this application but, in the meantime, MPC has dropped the price of 102 gas by $.50/Mcf, effective October 1, 1984. So, your Contract—when pay-off occurs—your payment will increase to $1.75/Mcf—but, as outlined in the contract, inasmuch as the price of our gas has dropped $.50, half of this will be absorbed by GHGS and the remaining 25% will be passed to, and absorbed by, Superior et al.

Frankly, by 1/1/85, I would not be surprised to see the price of our gas drop further, probably to around $3.15/Mcf, if MPC is successful.

Following this alert, GHGS wrote each seller another letter dated January 15, 1985:

De-regulation, along with Montana Power Company's new import permit, granted in December by the National Energy Board in Ottawa, has resulted in a further drastic drop in the price of our gas being sold to Montana Power Company.

The new price has now been dropped to $3.15 Mcf, reflecting a drop of $.70 Mcf for 102 gas—which was the basis of our pricing with Montana Power Company prior to deregulation.

Accordingly, under the terms of our Contract, whereby a decrease is shared equally by us, the price will now be $1.75 Mcf—less $.35—or $1.40 Mcf net to Superior/Mobil et al.

The impact of each correspondence presents the basis of the issue on each of the creditors' Proofs of Claim. Before November 1, 1984, GHGS was paying $1.75/Mcf (less $.50/Mcf credit for capital construction costs). On November 1, 1984, pursuant to GHGS' interpretation of paragraph 8.3 of the contract, GHGS reduced the price to $1.50/Mcf and on January 1, 1985, to $1.40/Mcf. Similar reductions in the Montana Power purchase price occurred effective January 1, 1986, and March 20, 1986, reducing Montana Power's price to $2.15/Mcf (Ex. 5). Following receipt of Montana Power's letter regarding the $2.15/Mcf price, on April 1, 1986, GHGS sent a copy of the notification letter to each creditor and stated (Ex. U):

Enclosed herewith please find a copy of our letter received from Montana Power Company, dated March 24, 1986. This is advising us of the Canadian Border price change, base price of $3.00/Mcf is reduced to base price of $2.15/Mcf, thus dropping the price .85¢ effective 3-20-86.

Accordingly, as per previous adjustments that were triggered by downward prices, this 85¢ will be absorbed 50/50 by Superior/Mobil and Gypsy Highview Gathering System, Inc.

Effective Mar. 20, 1986, the new price payable by GHGS for Blackleaf Canyon raw gas will be 90¢ per Mcf. This is a devastating reduction in gas prices, but no worse than the present falling oil prices. Nevertheless, under the terms of that certain contract, dated October 20, 1982, you may wish to renegotiate.

Accordingly, as the above stipulated facts show, GHGS made payments to each creditor, (then Mobil, Superior and Milestone), by check reflecting a price per/Mcf of $1.40, $1.325 and $.90. As a representative example, check 7313 of GHGS, payable to Superior Oil for $120,931.15, states in the legend:

4/30/86 Payment for gas purchase for period March 1/86 thru March 31/86 (31) days as per Blackleaf Canyon Contract dated Oct. 20, 1982 by and between Superior Oil Company, et al., and Gypsy Highview Gathering System, Inc. March 1, 1986—March 20, 1986
67,934Mcf × $1.325.................. = $ 90,012.55
(Gas Reduction from Montana Power Company as previously advised) effective March 20, 1986 $.85 reduction in gas purchase price divided by Gypsy Highview Gathering System, Inc., and Superior/Mobil ... .85¢ Divided by 2 = .425 = $1.325 − .425 = .90¢ March 20, 1986 thru March 31, 1986.
34,354Mcf × .90¢ .................. = $ 30,918.60
102,288Mcf...Total.                 Net ..... = $120,931.15

GHGS's interpretation of the pricing provision was corroborated by testimony of Carol Freedenthal, 1982 manager of market planning and sales of Superior Oil. Mr. Freedenthal was directly involved in and responsible for the contract negotiations between the parties, and reviewed to his satisfaction the final contract and addendum of October 20, 1982. The witness had reviewed the November 26, 1984, letter from GHGS sent to Freedenthal, set forth above, agreed with the price restructure and had no objection thereto. He stated without reservation that the October 20, 1982, addendum called for such adjustment.

The only dissent to the price change came from Superior's successor, Mobil Oil Corporation, when a Mobil employee, Brush (described by Freedenthal as a salesman with a recent law degree and below Freedenthal in the employment structure of Mobil) wrote GHGS that the deduction made by GHGS in 1984 of 25¢ per Mcf was contrary to the contract and GHGS was directed to "stop making these deductions immediately and issue a check to us to cover all prior deductions." Correspondence and meetings over Mobil's position ensued through September, 1985. This was GHGS's only "brush" with a contrary interpretation of the contract pricing provision. It is noteworthy that while the other sellers were supplied with the Brush correspondence, neither Milestone nor Williams asserted a position. More important, even after the Brush letters, which were never presented to Freedenthal, even though he was an employee of Mobil at the time, GHGS made further price reductions in 1986 and paid accordingly—all without any further comment or objection by any of the sellers.

█ It has long been basic contract law in Montana as articulated in *Lee v. Lee Gold Mining Co., et al.,* 71 Mont. 592, 599, 230 P. 1091, 1093 (1924) that—

[T]he intention of the parties is to be pursued if possible. This intention is to be gathered from the entire agreement, not from particular words or phrases or disjointed or particular parts of it.... The contract must be viewed from the beginning to end, and all its terms must pass in review; for one clause may modify, limit or illuminate the other.

*Federal Land Bank v. Texaco,* 250 Mont. 471, 820 P.2d 1269, 1271 (1991), involving an oil and gas lease, quotes *Lee* and *Steen v. Rustad,* 132 Mont. 96, 102, 313 P.2d 1014, 1018 (1957) in holding:

It is well established that a court, in interpreting a written instrument, will not isolate certain phrases of that instrument in order to garner the intent of the parties, but will grasp the instrument by its four corners and in light of the entire instrument, ascertain the paramount and guiding intention of the parties.

█ I find and conclude that GHGS's interpretation of the pricing provisions of the October 20, 1982, agreements comports with the intentions of the parties. The facts show the parties were deftly aware of oncoming deregulation of the natural gas market, by January 1, 1985. They could not, in 1982, predict its consequences. As a result, the parties provided a mechanism that if deregulation caused the Montana Power price for GHGS gas to raise, each would benefit by dividing that increase equally. "Conversely", as the document reads, if deregulation caused a market price decline by Montana Power, GHGS would be entitled to "at least a minimum of $0.55 per Mcf of purchased gas" for processing costs. In fixing that minimum, GHGS, as the parties intended, divided the decrease equally. In one respect, the sellers benefitted from this interpretation, for when the first price decrease was encountered in November, 1989, the downward price adjustment by GHGS resulted in a $.25 adjustment from $1.75 to $1.50/Mcf, rather than a minimum $0.55 decrease to $1.20/Mcf. No complaint from the sellers has been raised to that benefit. It was the intention of the parties to adjust upward or downward equally to both sides, depending on the effect of the ensuing deregulation.

And it is beyond any contrary argument that U.S. deregulation did in fact impact the Canadian Border price with the resultant effect that the Canadian Border price dictated the price under the 1977 Montana Power/GHGS contract. As night follows day, with swaps between both markets, U.S. gas policy affects Canadian markets, and Canadian gas policy affects U.S. markets. Deregulation occurred and the contract price between GHGS and the creditors had to be adjusted. The intent was the adjustment was to be shared 50/50. That is precisely what GHGS did and the successors-in-interest to the 1982 agreements have no basis under the contract to assert and maintain a contrary position. Other provisions of the addendum contract support GHGS's right to adjust the price from $1.75/Mcf. For example, ¶ 8.3 allows the seller, upon condition of lower prices, to stop supply; ¶ 15.1 gives the parties the option to renegotiate the price after January 1, 1985; and ¶ 15.4, the arbitration clause, provides the "price would be the fair market price determined by taking into account the price received by the buyer for his residue gas and liquid products [ (of which there were none) ], costs of processing and transportation and processing losses."

Finally, Mont.Code Ann. Section 30–2–107, a provision of Montana's Uniform Commercial Code, states:

(1) A contract for the sale of minerals or the like (including oil and gas) or a structure or its materials to be removed from realty is a contract for the sale of goods within this chapter if they are to be severed by the seller, but until severance a purported present sale thereof which is not effective as a transfer of an interest in land is effective only as a contract to sell.

By Mont.Code Ann. Section 30–2–208, the course of dealings between the parties becomes relevant in gleaning the intent of the parties.

(1) Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement.

(2) The express terms of the agreement and any such course of performance, as well as any course of dealing and usage of trade, shall be construed whenever reasonable as consistent with each other; but when such construction is unreasonable, express terms shall control course of performance and course of performance shall control both course of dealing and usage of trade (30–1–205).

*Oskey Gasoline & Oil Co. v. OKC Refining, Inc.*, 364 F.Supp. 1137, 1143 (D.Minn. 1973), interpreting an identical provision of 30–2–208(1), holds:

The conduct of the parties when performing may also be relevant in defining contract terms. *National Heater Co., Inc. v. Corrigan Co. Mech. Contractors, Inc.*, 482 F.2d 87 (8th Cir.1973).

\* \* \* \* \* \*

This contract did call for repeated performances by both parties. Defendant was to deliver product frequently, and if not daily, and plaintiff was to make repeated payments. Defendant was to bill plaintiff at least monthly. Both parties had knowledge of the other's performance and had the opportunity to object to it.

\* \* \* \* \* \*

In terms of 2–208 this "course of performance" by plaintiff and the continuation of deliveries by defendant without objection is both evidence of the way that parties construed the contract and a real objection to the way defendant now would like to construe the contract.

*Farmers Elevator Co. of Reserve v. Anderson*, 170 Mont. 175, 552 P.2d 63, 66 (1976), interpreting 2–208 (then 87A–2–208(1)) holds:

Under section 87A–2–208(1) "any course of performance accepted or acquiesced in without objection" is relevant to determine the meaning of the agreement under scrutiny.

\* \* \* \* \* \*

For although section 87A–2–208 would not specifically require a timely objection under these circumstances, such a condition must be implied if the law is to be construed with any meaning in the commercial setting. (Citing *Oskey*, supra).

In the present case, absolutely no objection to the payment for gas was ever made to the Debtor over the two-year, two-month period. Nor were any objections made to Debtor with regard to its letter advising of the price reduction, except for the Brush letters, where the facts show when a denial was made, the checks were still routinely negotiated and price reduction made after the Brush encounter. The course of conduct in the case leans heavily, if not conclusively, in favor of GHGS's contract interpretation. The objection of GHGS to the Proof of Claim of each creditor requesting payment for $1.75/Mcf of gas from the period of November 1984, to January 1987, must therefore be sustained, and claims rejected.

Even if I were to adopt the Mobil Oil position asserted by Brush in 1985, I would hold that each claim based on the period from November, 1984, to January, 1987, is barred by the statute of limitations.

On this issue, the creditor argued in the trial brief that the general 8 year statute of limitation regarding written contract actions is applicable to this case. Mont.Code Ann. Section 27–2–202.

■ I have already noted above in this Order that the sale of gas is goods and governed by the Montana Uniform Commercial Code, Section 30–2–107. The Montana UCC further provides under Mont. Code Ann. Section 30–2–725(1), that an action for breach of contract for sale must be commenced within four years after the cause of action has accrued, and the parties may not extend such period. Under Section 30–2–725(2), a cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. Under the creditor's theory of the case, the last breach occurred in January 1987, more than four years before any Proof of Claim was filed in this case.

*Trustees, Carbon Cty. Sch. v. Spivey*, 247 Mont. 33, 805 P.2d 61, 63 (1991) holds:

> The applicable rule of statutory construction requires the result that a specific statute controls over a general statute to the extent of any inconsistencies. *Bryant v. Hall* (1971), 157 Mont. 28, 33, 482 P.2d 147, 149–50; *Dept. of Revenue v. Davidson Cattle Co.* (1980), 190 Mont. 326, 329, 620 P.2d 1232, 1234.

Recognizing the shortened statute of limitations, the creditors argue that their claim is nevertheless timely since the applicable four year statute has been equitably tolled by GHGS's acknowledgment of claim through continued negotiations. Section 30–2–725(4) provides that the UCC statute of limitations does not alter the law on tolling of the statute of limitations. I find the creditors have failed to show by any credible evidence that GHGS's conduct tolled the running of the statute. The only evidence submitted through cross-examination of GHGS's Chief Executive Officer was that negotiations for continuation of gas production commenced in May 1988, and such commencement required a new pricing structure. This evidence, and all other exchanges regarding new price structuring, does not at all show GHGS recognized any creditor had a right of action against GHGS for underpayment of gas before January, 1987. Indeed, GHGS took just the opposite position when payment was made and none of the subsequent negotiations included any discussion with GHGS that the creditors felt aggrieved by those payments. I therefore reject the tolling argument as not supported by the evidence. Therefore, Mont.Code Ann. Section 27–2–409, which provides that an acknowledgment of the debt is sufficient evidence to cause a relevant statute of limitations to begin running anew is simply not applicable under the facts of this case. Moreover, that acknowledgement must be contained in some writing signed by GHGS. Section 27–2–409(2). No such document has been presented in evidence since none exists. The entire argument lacks merit.

Phase two of this controversy involves Meridian, which amended its claim seeking a total of $663,091.11, of which it claims

$131.813.36 based on gas sales from February 1989 to 1991. Blackleaf claims an additional $181,599.16 for the period for April 1, 1990 to September, 1991. Again, this issue arises from Meridian's insistence that the October 20, 1982, agreements mandate a payment of $1.75/Mcf.

The evidence shows that gas supplied to GHGS was terminated by the seller for a period between February, 1987, to July 1988. On July 26, 1988, the parties entered into a written agreement providing for the restructure of Article VIII of the 1982 addendum for a period from August 1, 1988 ending January 31, 1989. (Ex. Y–5). Meridian acknowledges that contract and accepts without objection payments made on gas supplies during that period. However, the July 26 letter also provides as follows:

> 3. The producers will attempt in good faith to negotiate an amendment and restatement prior to January 31, 1989, of the existing contracted dated October 20, 1982, to formally address this proposal to cover future periods beyond January 31, 1989.
>
> 4. With the exception of the reduced contract prices and volumes outlined in paragraph 1 above, that are effective August 1, 1988, all of the existing terms and conditions of the October 20, 1982, GHGS purchase contract remain the same until such date they are formally amended by both GHGS and the producers.

While the parties acknowledged a desire to renegotiate pricing schedules for the period beyond January 31, 1989, hopefully before that date, such did not occur. Meridian asserts no other contract on pricing as contemplated was reached by the parties, so that the pricing schedule of the 1982 agreement was reinstated. It is important to recognize that in the July 27 letter, GHGS waived the HMMcf/day minimum delivery requirement of 1982 contract, obviously recognizing that the gas units were not capable of producing that quantity. At that time Montana Power was paying 2.10/Mcf, and production experience showed that the Blackleaf Canyon Gas had a "shrinkage" factor of about ⅓ of the gas delivered per Mcf. Cost of production was .55¢/Mcf. Thus, if GHGS had to pay $1.75/Mcf, as asserted by Meridian, it was obviously a financial impossibility.

On this basis, GHGS continued its negotiations with the gas operator, EPS Resources, owner of Blackleaf Gas Associates, Inc. It is further noted at this point, that EPS filed the original Proof of Claim on behalf of Meridian, as "its agent", without seeking payment of the phase two period. Meridian explains that it was not scheduled as a creditor, learned of the bankruptcy filing shortly before the claims bar date, and hurriedly had EPS prepare and file the claim. It was not until discovery was developed that Meridian amended its claim on October 30, 1992.

The Debtor has shown to satisfaction of the Court by a preponderance of the evidence that a new pricing schedule was indeed agreed to by the sellers through EPS on July 18, 1989, after a series of oral negotiations between EPS and GHGS. On July 18, 1989, GHGS sent a letter of understanding to one Howard Farkas, owner of EPS, setting forth the provision that GHGS would continue to produce below 2.0 Mcf/day pursuant to prices of $.75 Mcf to 1.20/Mcf, depending on the gas volume delivered. Meridian claims it is not bound by that agreement nor is it signatory thereto. Conversely, Blackleaf has attached such letter to its proof of claim, thereby relying on it.

The stipulated facts in this case show GHGS made payments to the creditors beyond the expiration of the 6 month period at price negotiated in the July 27, 1988, agreement. GHGS then made payments after July 18, 1989 based on the Farkas letter. The sellers accepted the monthly payments without objection. Indeed, the legend on GHGS check # 14083, dated December 28, 1990, in the sum of $8,263.10 recites the payment is made "as per that certain letter agreement dated July 18, 1989." The check was sent to the attention of David S. Dale, Sr., attorney. Other Meridian checks provide the same legend description, specifically noting the July 18, 1989 letter.

Two well settled principles of law resolve the Meridian and Blackleaf claims for phase two. First, substantial evidence exists that the oral agreement with Farkas, memorialized by the July 18, letter, amended by performance the October 20, 1982, agreements on pricing. *Haines Pipeline Const. v. The Montana Power Company*, 251 Mont. 422, 830 P.2d 1230, 1235 (1991) holds:

> Substantial evidence exists to support the District Court's finding that the pipeline contract was amended by performance and oral agreement of the parties. Furthermore, when a written contract is altered or modified by an executed oral agreement, parol evidence of the alteration or modification can be heard. *Jensen v. Olson* (1984), 144 Mont. 224, 395 P.2d 465.

Mont.Code Ann. Section 30–2–209 provides:

> (3) The requirements of the statute of frauds section of this chapter (30–2–201) must be satisfied if the contract as modified is within its provisions.

Mont.Code Ann. Section 30–2–201 provides a contract for sale of goods for a price of $500 or more must be evidenced by a writing, except that a contract which does not satisfy that requirement is nevertheless enforceable—

> (3)(c) with respect to goods for which payment has been made and accepted or which have been received and accepted (30–2–606).

■ Second, it is clear from the evidence that in the spring of 1988, EPS, having acquired at public auction the interest of Mobil Oil, entered into negotiations with GHGS to resume delivery of Blackleaf Canyon Gas. EPS became operator of the field. This lead to the agreement of July 27, 1988, and the oral agreement set forth in the July 18, 1989, agreement. No evidence was introduced by Meridian that it had no knowledge of the July 1989 agreement. By letter of July 31, 1989, from Farkas to Meridian, Meridian is advised of proposed price decreases by Montana Power with an attendant new pricing schedule of .0575/Mcf to 1.025 Mcf depending on gas production. The parties were thus in contact. I conclude that Meridian has notice of the July 1989 price agreement between Farkas (EPS) and GHGS through EPS, its agent. This issue is settled by the holding in *Bolz v. Myers*, 200 Mont. 286, 651 P.2d 606, 612 (1982), which states:

> We have held that a principal who accepts the

> benefits of an agency transaction cannot later deny the agency, that the principal ratifies the transaction by receiving the benefits, and he is estopped to deny the agency. *First National Bank of Miles City v. Nunn* (1981), [192] Mont. [487], 628 P.2d 1110, 1116, 38 St.Rep. 869.

Likewise in the case *sub judice*, Meridian accepted the benefits of the gas purchase contract negotiated by EPS, its agent. By accepting payment, it cannot now be heard to disclaim EPS's right to settle and agree on a new pricing schedule with GHGS. Accordingly, GHGS's objection to that portion of the Meridian and Blackleaf claims for additional gas production payment post February 1989, has merit and it must be sustained.

IT IS ORDERED:

1. The Debtor's objection to the Proof of Claim of Meridian Oil, Inc., in the sum of $663,091.11 (Exhibit 35) is sustained and the claim is rejected;

2. The Debtor's objection to the Proof of Claim of Fina Oil & Chemical Co., Inc. in the sum of $293,196.20 is sustained and the claim is rejected;

3. The Debtor's objections to the Proofs of Claim of Blackleaf Partners/Blackleaf Gas Associates in the sum of $1,465,980.99 and $181,599.16 are sustained and the claims are rejected.