**Ernest CANNON, Appellant,**

v.

**SUN–KEY OIL CO., INC., Appellee.**

**No. 11–02–00286–CV.**

Court of Appeals of Texas, Eastland.

Aug. 29, 2003.

Rehearing Overruled Nov. 6, 2003.

Jerry Campbell, Naman, Howell, Smith & Lee, LLP, Waco, Keith Cameron, Naman, Howell, Smith & Lee, Austin, for appellant.

Don M. Connally, Abilene, for appellee.

Panel consists of ARNOT, C.J., and WRIGHT, J., and McCALL, J.

### Opinion

W.G. ARNOT, III, Chief Justice.

Ernest Cannon sought a declaratory judgment terminating an oil and gas lease

covering a 352–acre production unit. In his petition, Cannon alleged alternative theories for termination: (1) "total cessation of production" after the primary term and (2) a "cessation of production in paying quantities" after the primary term. Sun–Key Oil Co., Inc., the lessee by assignment, asserted that the lease never terminated. Alternatively, Sun–Key asserted that Cannon revived the lease after the alleged termination by recognizing its validity in letters that he sent to Sun–Key and another entity.

Cannon's "total cessation of production" theory was not submitted to the jury. Cannon's "cessation of production in paying quantities" theory was submitted in Question Nos. 1 and 2. The jury answered Question Nos. 1 and 2 in Cannon's favor, but also found that Cannon had revived the lease in response to Question No. 6. Based on the jury's finding of revivor, the trial court entered judgment that Cannon take nothing on his claim for declaratory judgment. The trial court awarded Sun–Key the amount of $10,000 in attorney's fees. In his appeal, Cannon asserts that there was no evidence to support the jury's finding of revivor. In a cross-point, Sun–Key maintains that there was no evidence to support the jury's finding in response to Question No. 2 that a reasonably prudent operator would not have continued to operate the lease as it related to the Parkey No. 1 Well in the manner in which it was operated for the purpose of making a profit and not merely for speculation. We agree with Cannon that there was no evidence to support the jury's finding of revivor. However, we find that there was no evidence to support the jury's finding in response to Question No. 2. Therefore, we sustain Sun–Key's cross-point and affirm the trial court's judgment.

### Background Facts

Cannon owns the surface estate and one-half (½) of the mineral estate of approximately 6,034.79 acres known as the Parkey Ranch in Erath County. In 1973, Cannon's predecessors-in-title, as lessors, entered into an oil and gas lease covering 6,518 acres, including the Parkey Ranch. The lease created 11 units within the 6,518 acres and provided that "each unit will be independent of the other units as though covered by a separate lease." The lease had a primary term of five (5) years and a secondary term for "as long thereafter as oil or gas is produced therefrom, subject to the conditions as hereinafter provided."

In 1978, the lessee completed the Parkey No. 1 Well on one of the units covered by the lease. The Parkey No. 1 Well produced gas, and the lessee designated the well as the Parkey Ranch Unit No. 1, Well No. 1 production unit covering 352 acres. This 352–acre unit is the subject of this cause. We will refer to the 1973 lease as it relates to the subject 352 acres as the Lease.

In 1994, D and N Natural Gas Operating Co., Inc. received an assignment of the Lease from the lessee and began operating the Parkey No. 1 Well. The Parkey No. 1 Well continued to produce gas and make a profit, but required substantial monthly compressor costs for production. With the agreement of James R. Parkey, Jr., D and N decided to build a new pipeline on the Parkey Ranch, with plans to have 16 wells feed into the pipeline, including the Parkey No. 1 Well and three other wells operated by D and N on the Parkey Ranch. One benefit of the planned pipeline was that D and N would no longer have to incur substantial compressor costs to produce the Parkey No. 1 Well.

In October 1995, D and N shut down the Parkey No. 1 Well in connection with the decision to build the pipeline but planned to resume production from the well after

completion of the pipeline. After completing the pipeline in May 1996, D and N attempted to resume production from the well, but it would not produce. D and N conducted various operations to determine the cause of the problem. In June 1997, D and N discovered a hole in one of the drill collars on the well. D and N replaced the drill collar, and the well began producing immediately. D and N connected the well to the new pipeline.

In August 1997, Cannon purchased his interest in the Parkey Ranch. In 1998, D and N assigned its undivided interest in the Lease to Sun–Key. Sun–Key began operating the Parkey No. 1 Well. Thereafter, Cannon filed this action, alleging that the Lease terminated during D and N's operation of the well.

### Issues Presented

In three issues, Cannon asserts that (1) the trial court erred in submitting Sun–Key's revivor defense to the jury because there was no evidence to support its submission, (2) the trial court erred in its submission of the revivor question by failing to submit proper instructions of the requirements of revivor, and (3) Sun–Key is not entitled to recover attorney's fees if this court sustains his revivor issues because Sun–Key would no longer be the successful party. In a cross-point, Sun–Key asserts that the trial court erred in denying its motion for judgment notwithstanding the verdict because there was no evidence to support the jury's finding in response to Question No. 2 that a reasonably prudent operator would not have continued to operate the Lease in the manner in which it was operated. Therefore, Sun–Key contends that the Lease did not terminate.

We sustain Sun–Key's cross-point and, therefore, find that the Lease did not terminate. We address the revivor issue, however, because Sun–Key presented the revivor defense as an alternative ground for finding that the Lease is in effect.

### Revivor

Sun–Key had the burden of proof on its defense that Cannon revived the lease. Cannon asserts that there was no evidence to support the submission of the revivor issue to the jury. To address Cannon's "legal sufficiency" or "no evidence" challenge, we must consider only the evidence and inferences that tend to support the finding, disregarding any evidence or inferences to the contrary. *Southwest Key Program, Inc. v. Gil–Perez,* 81 S.W.3d 269, 274 (Tex.2002); *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965); *see Merrell Dow Pharmaceuticals, Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997), *cert. den'd,* 523 U.S. 1119, 118 S.Ct. 1799, 140 L.Ed.2d 939 (1998). An appellate court will sustain a no-evidence issue when: (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the only evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Company v. Martinez,* 977 S.W.2d 328, 334 (Tex.1998). If there is any evidence to support the finding, we must overrule the no-evidence point. *Juliette Fowler Homes, Inc. v. Welch Associates, Inc.,* 793 S.W.2d 660, 666 (Tex.1990); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660 (1951).

 Under the doctrine of revival, a lifeless lease is revived by the subsequent execution of a formal document which expressly recognizes in clear language the validity of the lifeless lease. *Westbrook v. Atlantic Richfield Company,* 502 S.W.2d 551 (Tex.1973); *Exploracion De La Estrel-*

*la Soloataria Incorporacion v. Birdwell,* 858 S.W.2d 549, 554 (Tex.App.-Eastland 1993, no writ). The subsequent formal document must make a sufficient reference to the lease to revive it. *Westbrook v. Atlantic Richfield Company,* supra at 555. Williams and Meyers explain that, because revivor grants a new estate in land, the estate "should not be held to have been granted without a showing of intent to grant it." HOWARD R. WILLIAMS & CHARLES J. MEYERS, OIL AND GAS LAW § 340.04 (2002).

Courts have held that the subsequent execution of mineral deeds referring to lifeless oil and gas leases and recognizing their validity revived the leases. *Humble Oil & Refining Co. v. Clark,* 126 Tex. 262, 87 S.W.2d 471, 473 (1935)(Deed providing that it covered property held by a lease and that "this sale is made subject to the terms of said lease" revived the lease that had terminated for the nonpayment of rentals); *Loeffler v. King,* 149 Tex. 626, 236 S.W.2d 772, 774 (1951)(Deed providing that the land was "under an Oil and Gas lease" revived the lease that had terminated for lack of production in paying quantities). However, in *Westbrook,* the court held that the execution of agreements neither referring to a terminated lease nor containing "any inference of validity of the [lease] or even of its existence" did not revive the lease. *Westbrook v. Atlantic Richfield Company,* supra at 556.

Sun–Key relied on five documents to support its revivor defense: (1) a letter from William L. Durham, Cannon's attorney, to Sun–Key, dated October 23, 1997; (2) a letter from Cannon to D and N, dated December 5, 1997; (3) a letter from Durham to D and N, dated December 10, 1997; (4) a letter from Cannon to D and N, dated January 26, 1998; and (5) the Special Warranty Deed executed by Jolene P. Parkey,

as Grantor, to Cannon, as Grantee, dated August 28, 1997.

We first address Durham's October 23, 1997, letter to Sun–Key and his December 10, 1997, letter to D and N because they were similar. Durham did not refer to the Lease in the letters. He stated that Cannon had purchased 6,043.79 acres of land from Parkey and enclosed copies of the August 28, 1997, Special Warranty Deed. He also stated that the deed conveyed one-half (½) of the oil, gas, and other minerals in and under the property to Cannon and that Cannon was entitled to receive all royalty, lease bonus, and delay rental payments pertaining to "Grantee's Mineral Estate" accruing since August 28, 1997. These statements regarding "Grantee's Mineral Estate" did not refer to any leases, much less recognize the validity of any leases. Durham requested that Sun–Key and D and N "take appropriate action as required by law, applicable mineral leases and other documents pertaining to the property to protect Mr. Cannon's livestock from [their] well sites, pipelines, etc." However, this request did not recognize that there were, in fact, any applicable leases.

In his December 5, 1997, letter, Cannon stated that he had purchased the surface and mineral estates of the Parkey Ranch. He requested that D and N change its records to reflect payment of royalties to him. He also stated that D and N's well locations were causing risks to livestock, property, and people. Cannon requested D and N to take steps to protect against the risks. The January 26, 1998, letter was a follow-up to the December 5, 1997, letter. Cannon stated that D and N had not taken any steps to correct deficiencies in the maintenance of its well sites. He demanded that D and N begin to correct the deficiencies within five days. The December 5, 1997, and January 26, 1998,

letters did not refer to any leases or recognize the validity of any leases.

The August 28, 1997, Special Warranty Deed provided that the conveyance of the property was subject to "[a]ll valid and subsisting, outstanding and duly recorded oil and gas leases, which are vested in parties other than Grantor as of the date hereof." However, the deed did not identify any valid and subsisting leases, nor did it refer to any specific leases. The language of the deed was insufficient to revive the Lease. *See Westbrook v. Atlantic Richfield Company*, supra at 555–56.

■ The letters and deed did not refer to the Lease, much less contain language showing an intent to grant a new estate in the 352 acres. They did not contain language to the effect that the property was subject to the Lease. They did not recognize in clear language the validity of the Lease. They did not revive the Lease.[1] *See Westbrook v. Atlantic Richfield Company*, supra; *see also Loeffler v. King*, supra; *Humble Oil & Refining Co. v. Clark*, supra.

Because there was no evidence to support the finding of revivor, we need not address Cannon's complaint in his second issue that the trial court failed to submit proper instructions of the requirements of revivor. In his third issue, Cannon asserts that, if his revivor issues are sustained, the trial court's award of attorney's fees to Sun–Key should be reversed because Sun–Key would no longer be the successful party. Cannon's third issue is overruled because, based upon our ruling on the cross-point, Sun–Key remains the successful party in this action.

### Cessation of Production in Paying Quantities

■ A lessor seeking to establish that a lease terminated because of a "cessation of production in paying" quantities must meet a two-prong test: (1) that the lease failed to yield a profit over a reasonable period of time and (2) that a reasonably prudent operator would not have continued to operate the well in the manner in which it was being operated for the purpose of making a profit and not merely for speculation. *Skelly Oil Company v. Archer*, 163 Tex. 336, 356 S.W.2d 774, 783 (1962); *Clifton v. Koontz*, 160 Tex. 82, 325 S.W.2d 684, 690–91 (1959). Sun–Key asserts in its cross-point that the trial court erred in denying its motion for judgment notwithstanding the verdict because there was no evidence to support the jury's finding with respect to the second prong of the test.

■ In his reply brief, Cannon asserts that the two-prong "cessation of production in paying quantities" analysis does not apply in this case because there was a "total cessation of production" from the Lease. Case law recognizes a distinction between a "total cessation of production" and a "cessation of production in paying quantities." *See Ridenour v. Herrington*, 47 S.W.3d 117, 121–22 (Tex.App.-Waco 2001, pet'n den'd); *Bachler v. Rosenthal*, 798 S.W.2d 646, 650 (Tex.App.-Austin 1990, writ den'd); *Wainwright v. Wainwright*, 359 S.W.2d 628, 630 (Tex.Civ.App.-Fort Worth 1962, writ ref'd n.r.e.). A "total cessation of production" occurs when a well that has been producing gas ceases to produce any quantity of gas. When there has been a "total cessation of production," the two-prong "cessation of production in paying quantities" analysis does not apply. *Ridenour v. Herrington*, supra at 121–22;

---

1. Because the language in the letters was insufficient to revive the lease, it is not necessary to determine whether the letters constituted "formal documents" with respect to the revivor issue.

*Bachler v. Rosenthal*, supra at 650; *Wainwright v. Wainwright*, supra at 630.

■ In his petition, Cannon alleged a "total cessation of production" as an alternative theory for terminating the Lease. His claim that the Lease terminated based on a "total cessation of production" was an independent theory of recovery upon which he had the burden of proof. However, Cannon did not request that a "total cessation of production" issue be submitted to the jury. The only cessation issue submitted to the jury inquired whether the Lease had a "cessation of production in paying quantities." In his reply brief, Cannon asserts that the evidence conclusively established a "total cessation of production" and requests we find as a matter of law that there was a "total cessation of production." Cannon did not request the trial court to make a finding on this issue. We find that Cannon waived the "total cessation of production" issue. TEX. R.CIV.P. 279; TEX.R.APP.P. 33.1.

We review the denial of Sun–Key's motion for judgment notwithstanding the verdict under a legal sufficiency standard. *Navarette v. Temple Independent School District*, 706 S.W.2d 308, 309 (Tex.1986). The legal sufficiency standard is set forth above.

■ Cannon had the burden to prove that a reasonably prudent operator would not have continued to operate the Lease in the manner in which it was operated for the purpose of making a profit and not merely for speculation during the period of cessation. *Clifton v. Koontz*, supra. In *Clifton*, the supreme court explained the "reasonably prudent operator" standard:

> In the case of a marginal well, such as we have here, the standard by which paying quantities is determined is whether or not under all the relevant circumstances a reasonably prudent op-

erator would, for the purpose of making a profit and not merely for speculation, continue to operate a well in the manner in which the well in question was operated.

> In determining paying quantities, in accordance with the above standard, the trial court necessarily must take into consideration all matters which would influence a reasonable and prudent operator. Some of the factors are: The depletion of the reservoir and the price for which the lessee is able to sell his produce, the relative profitableness of other wells in the area, the operating and marketing costs of the lease, his net profit, the lease provisions, a reasonable period of time under the circumstances, and whether or not the lessee is holding the lease merely for speculative purposes.

*Clifton v. Koontz*, supra at 691; see also *Anadarko Petroleum Corporation v. Thompson*, 94 S.W.3d 550, 559 (Tex.2002); *Bales v. Delhi–Taylor Oil Corporation*, 362 S.W.2d 388, 391 (Tex.Civ.App.-San Antonio 1962, writ ref'd n.r.e.). One court has explained that the lessor must prove that a reasonably prudent operator would not have continued under the circumstances in the attempts devoted to obtaining such production. *Ballanfonte v. Kimbell*, 373 S.W.2d 119, 121 (Tex.Civ.App.-Fort Worth 1963, writ ref'd n.r.e.).

■ Only two witnesses, both called by Sun–Key, presented testimony regarding the "reasonably prudent operator" issue: (1) Joe Delaney of D and N and (2) L.H. Jones of Sun–Key. Cannon had designated an expert witness to testify on oil and gas issues, but the trial court excluded the testimony based on Sun–Key's objection that the designation was untimely. Cannon asserts that the cross-examination testimony of Delaney and Jones provided evidence to support the jury's finding.

On direct examination, Delaney testified about the history of the Parkey No. 1 Well and D and N's operation of the well. D and N acquired and began operating the Parkey No. 1 Well and three other wells on the Parkey Ranch in 1994. The Parkey No. 1 Well had been profitable for years. D and N continued to produce it for a profit, but D and N had to incur high compressor costs to produce it.

Delaney developed a plan to construct an above surface pipeline on the Parkey Ranch. He planned to have 16 wells feed into the pipeline, including the Parkey No. 1 Well and the other three D and N wells. Delaney testified that the new pipeline would allow D and N to produce its wells in a more efficient manner. Delaney stated that D and N would no longer have to incur high compressor costs to produce the Parkey No. 1 Well. Delaney testified that James Parkey orally agreed that D and N could lay the pipeline.

Delaney further testified that D and N shut down the Parkey No. 1 Well in October 1995 as part of the plan to build the pipeline. D and N completed the pipeline in May 1996. D and N attempted to resume production from the Parkey No. 1 Well at that time, but the well would not produce. Delaney testified that D and N conducted various activities on the well in an effort to determine the cause of the problem with the well. For example, D and N had the well swabbed in May 1996 and several times during the summer of 1996. D and N also put a pump jack on the well. In the fall of 1996, D and N had a contractor clean the road so that equipment could be brought in to work on the well in the spring of 1997. As the summer of 1997 approached, D and N pulled the pipe from the well two or three times, replaced the downhole pump on the well, and worked on the pump jack. In June 1997, D and N pulled all the pipe from the

well, pressured the pipe up one piece at a time, and discovered that the second to the last drill collar had a hole in it. Within 24 hours of the discovery, D and N replaced the collar, and the well began producing immediately.

D and N connected the Parkey No. 1 Well and its other wells to the pipeline. Thereafter, Cannon purchased the Parkey Ranch. Delaney testified that Cannon requested him to pick up D and N's pipeline. Delaney stated that he believed he had to pick up the pipeline because he and James Parkey had not entered into a written agreement regarding the pipeline. Delaney testified that D and N could not produce its wells economically without the pipeline. D and N sold its interest in the Parkey No. 1 Well to Sun–Key. Delaney stated that Sun–Key routed the production from the Parkey No. 1 Well to another pipeline. D and N plugged its other wells, picked up its pipeline from the Parkey Ranch, and went out of business.

In Delaney's opinion, he diligently tried to restore production from the Parkey No. 1 Well during the period it was not producing. Delaney testified that he determined the cause of the problem through a series of experiments on the well. In his opinion, a prudent operator would have continued to operate the well with an expectation of profit and not merely for speculation. Delaney stated that he was operating the well for the purpose of making a profit. Delaney thought that the well would produce for another 10 or 15 years.

On cross-examination, Delaney testified that he shut down the Parkey No. 1 Well in October 1995 by turning off the compressor. Delaney stated that the well did not produce from October 1995 through June 1997. Delaney did not plan to have the well down for 20 months. Delaney testified that D and N sacrificed the production from the well as part of the plan to

construct the pipeline. He stated that D and N could have completed the pipeline before shutting down the well. He also stated that an operator can cause damage to a well by shutting it down improperly.

On direct examination, Jones testified that, in his opinion, D and N diligently tried to restore production from the Parkey No. 1 Well in a reasonable manner as a reasonable operator would have attempted to do. Jones stated that D and N did not take an inordinate amount of time to restore production. Jones also stated that, when the well was down, Delaney worked on the well and tried to figure out what was causing the problem. In Jones's opinion, a prudent operator would have continued to operate the well expecting a profit and not merely for the purpose of speculation.

On cross-examination, Jones testified that D and N did not have to shut down the well before constructing the pipeline. Jones stated that D and N completed the pipeline in May 1996.

Cannon asserts that the cross-examination testimony of Delaney and Jones established that D and N operated the Parkey No. 1 Well in an unreasonable manner. Therefore, Cannon argues that there was evidence to support the jury's finding that a reasonably prudent operator would not have continued to operate the well in the manner in which D and N operated it. To support his argument, Cannon relies on the length of time that the well was down—20 months—and the cross-examination testimony of Delaney and Jones (1) that D and N did not have to shut down the well before building the pipeline, (2) that an operator can cause damage to a well by shutting it down improperly, and (3) that Delaney did not plan for the well to be down for 20 months.

Cannon places special emphasis on Delaney's testimony in which he said, "I think a reasonable and prudent operator would probably approach it different the second time." However, the record shows that Delaney was referring to the fact that he did not have a written agreement with James Parkey regarding the pipeline. Given another opportunity, Delaney stated that he would want to have a written agreement regarding the pipeline.

Cannon did not present any evidence that a reasonably prudent operator would have operated the well in a different manner, would have restored production sooner, or would not have continued under the circumstances in the attempts devoted to obtaining such production. Considering the factors listed by the court in *Clifton*, we find that there was no evidence to support the jury's finding. Sun–Key's cross-point is sustained.

### *This Court's Ruling*

The judgment of the trial court is affirmed.