# FILED

August 27 2013

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

DA 12-0666

## IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2013 MT 241

IRENE M. MOERMAN and JOHN H. MOERMAN,

        Plaintiffs and Appellants,

  v.

PRAIRIE ROSE RESOURCES, INC.,
a North Dakota Corporation,

        Defendant and Appellee.

APPEAL FROM:    District Court of the Seventh Judicial District,
In and For the County of Wibaux, Cause No. DV 11-11
Honorable Richard A. Simonton, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

            Brian D. Lee; Lee Law Office, P.C.; Shelby, Montana

        For Appellee:

            Albert R. Batterman; Batterman Law Offices, P.C.; Baker, Montana

                      Submitted on Briefs:  May 28, 2013

                                 Decided:  August 27, 2013

Filed:

                               _____
                                       Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 Irene and John Moerman appeal the judgment and order of the District Court for the Seventh Judicial District, Wibaux County, denying their claim that the oil and gas lease at issue in this case has expired or has been forfeited. We affirm.

¶2 We address the following issues on appeal:

¶3 1. Whether the District Court correctly concluded that the parties' oil and gas lease remained in effect.

¶4 2. Whether the District Court was correct in awarding Prairie Rose Resources, Inc. (Prairie), its attorney fees.

**Factual and Procedural Background**

¶5 Irene and John Moerman (the Moermans) lived on a ranch in Wibaux County, Montana, until 1995, when they sold the ranch to Jim Kane. John's father, Anton Moerman, had acquired the ranch (which included both the surface and mineral estates with the exception of coal) via a land patent. The Moermans, who are now divorced, reserved for themselves life estates to the mineral rights on the ranch with the remainder to vest in their three children. The well in question was originally drilled almost thirty years ago, but was subsequently shut in and abandoned.

¶6 In 2006, Prairie, an oil and gas development company incorporated in North Dakota, leased the well from the Moermans, but failed to bring the well into production during the lease period. Consequently, the 2006 lease terminated. In June 2010, the

2

Moermans each[1] signed a new Oil and Gas Lease with Prairie. These leases were for six months with the primary term of each lease from June 1, 2010, to December 1, 2010. Michael Gleason, Prairie's president, paid the Moermans $32,000 for the leases.

¶7    The leases granted to Prairie the exclusive right to the oil and gas in the south half of Section 30, Township 18 North, Range 59 East, M.P.M., for exploration and development purposes. The leases required that Prairie pay the Moermans a royalty of one-eighth of all oil produced and saved from the leasehold premises. As to the term, the leases provided:

> It is agreed that this lease shall remain in force for a term ending December 1, 2010 and as long thereafter as oil or gas of whatsoever nature or kind is produced from said leased premises or on acreage pooled therewith, or drilling operations are continued as hereinafter provided. If, at the expiration of the primary term of this lease, oil or gas is not being produced on the leased premises or on acreage pooled therewith but Lessee is then engaged in drilling or re-working operations thereon, then this lease shall continue in force so long as operations are being continuously prosecuted on the leased premises or on acreage pooled therewith; and operations shall be considered to be continuously prosecuted if not more than one hundred eighty (180) days shall lapse between the completion or abandonment of one well and the beginning of operations for the drilling of a subsequent well. If after the discovery of oil or gas on said land or on acreage pooled therewith, the production thereof should cease from any cause after the primary term, this lease shall not terminate if Lessee commences additional drilling or re-working operations within one hundred eighty (180) days from the date of cessation of production or from date of completion of dry hole. If oil or gas shall be discovered and produced as a result of such operations at or after the expiration of the primary term of this lease, this lease shall continue in force so long as oil or gas is produced from the leased premises or on acreage pooled therewith.

---

[1] Because the Moermans were divorced, two separate leases were executed; however, the terms of the leases are identical.

3

¶8    Prairie assigned the leases to PB Oil Company, LLP (PB Oil),[2] an oilfield service company operating in the Sidney, Montana, area, subject to the reservation of a small overriding royalty interest. PB Oil then contracted with TOI Operating, Inc. (TOI) as the bonded contractor to bring the well into production.

¶9    Keith Carver, a petroleum engineer working for both PB Oil and TOI, worked to get the well into production. Carver testified that because of the high demand for drilling rigs, he was unable to get a "work-over rig" to the well site until November 2010. Carver further testified that he constructed a pad for the pump, installed the hardware and equipment necessary to produce oil at the site, and replaced the pumping unit. Carver testified that he started the well up on November 29, 2010, to make sure it would produce, but he had to leave the site early due to a blizzard. Carver returned to the site on December 1, 2010, but he was prevented from returning the following day due to the severe weather conditions.

¶10    On December 9, 2010, Carver again managed to get to the well to prepare the site for inspection by the Montana Board of Oil and Gas Conservation (BOGC). An inspector from BOGC visited the site on December 10 and 13, 2010. The inspector reported that the well was producing and that there was over seven feet of oil in the storage tanks. The BOGC referred to this well as the "Moerman 14-30."

¶11    Gleason called John Moerman on December 10, 2010, to notify him that the well was producing. The record indicates that John Moerman failed to inform his ex-wife of

---

[2]  PB Oil was not a party to this action.

Gleason's call. The record further indicates that John attempted to testify at trial, but due to health and memory issues, he was excused.

¶12 Gleason contracted with Shell Oil Corp. to purchase the oil from Moerman 14-30, but before the oil could be sold, Gleason was required to obtain a mineral title opinion to demonstrate clear title to the oil. Gleason contacted several attorneys throughout the latter part of 2010 and the early part of 2011, but because of the growth of the Bakken oil fields in North Dakota, there was a significant backlog in the production of title opinions. Gleason testified at the January 19, 2012 trial that he expected to have a completed title opinion by February 15, 2012, after which time he could begin selling the oil.

¶13 While Prairie was working to produce oil at Moerman 14-30 in the south half of Section 30, and to bring it to market, the Moermans leased the mineral rights to the north half of Section 30 to another company. Irene testified that because she had not received notice that Moerman 14-30 was producing, she assumed the leases with Prairie had expired in December 2010. Because Irene wished to lease the mineral rights to the south half of Section 30 to the same drilling company to which the Moermans had leased the mineral rights to the north half of Section 30, the Moermans' attorney sent a letter to Prairie dated February 18, 2011, requesting that Prairie release those leases. Although Gleason later acknowledged that he had received the Moermans' letter, he did not respond.

¶14 Gleason testified that the cost to Prairie and TOI to get Moerman 14-30 producing was approximately $150,000. In addition, Carver testified that if the well was leased out from under him, he would either have to plug the well or sell the well bore, all of which

5

would result in his incurring significant losses. Consequently, Prairie declined to cancel the leases.

¶15 On July 27, 2011, the Moermans filed a complaint for declaratory judgment claiming that their oil and gas leases with Prairie had expired. The Moermans complained that they were unable to re-lease the premises unless Prairie's lease was voided. Prairie counterclaimed for a declaration that the lease remained in effect, and alleged that the Moermans had breached the contract as well as the implied covenant of good faith and fair dealing.

¶16 A bench trial was held on January 19, 2012. On February 15, 2012, the District Court issued its Findings of Facts, Conclusions of Law, Judgment and Order wherein the court found the lease to be in full force and effect, and awarded Prairie its attorney fees and costs pursuant to § 82-1-202, MCA. Notably, the court also pointed out that "Defendant should consider that with better communication between it and Plaintiffs, this action may not have been filed." The Moermans appealed.

## Standard of Review

¶17 This Court reviews the findings of fact of a district court sitting without a jury to determine if the court's findings are clearly erroneous. *Varano v. Hicks*, 2012 MT 195, ¶ 7, 366 Mont. 171, 285 P.3d 592 (citing *Olsen v. Milner*, 2012 MT 88, ¶ 16, 364 Mont. 523, 276 P.3d 934). We review a district court's conclusions of law to determine whether the court's interpretation of the law is correct. *Somont Oil Co., Inc. v. A. & G. Drilling, Inc.*, 2002 MT 141, ¶ 14, 310 Mont. 221, 49 P.3d 598 (*Somont I*), *overruled on other grounds by Johnson v. Costco Wholesale*, 2007 MT 43, 336 Mont. 105, 152 P.3d 727

(citing *Carbon County v. Union Reserve Coal Co.*, 271 Mont. 459, 469, 898 P.2d 680, 686 (1995)).

¶18 In addition, our standard of review of a trial court's order granting or denying attorney fees and costs is whether the court abused its discretion. *Somont Oil Co., Inc. v. A. & G. Drilling, Inc.*, 2006 MT 90, ¶ 25, 332 Mont. 56, 137 P.3d 536 (*Somont II*), *overruled on other grounds by Johnson v. Costco Wholesale*, 2007 MT 43, 336 Mont. 105, 152 P.3d 727 (citing *Gullett v. Van Dyke Const. Co.*, 2005 MT 105, ¶ 12, 327 Mont. 30, 111 P.3d 220).

**Issue 1.**

¶19 *Whether the District Court correctly concluded that the parties' oil and gas lease remained in effect.*

¶20 The Moermans contend that the undisputed evidence demonstrates that the Moerman 14-30 well did not produce oil until after the expiration of the primary term of the lease. The Moermans also contend that even if Moerman 14-30 had produced oil in sufficient quantities to extend the lease beyond the primary term, Prairie failed to prove that the five-month cessation of production in 2011 was authorized under the temporary cessation of production doctrine. Consequently, the Moermans argue that based on either of these scenarios, the lease automatically terminated and they are entitled to an order declaring the same.

¶21 Prairie contends that the uncontroverted evidence indicates that Prairie had at all times acted with diligence in establishing oil production, and that the lease remained in effect because the Moerman 14-30 well did produce oil prior to the expiration of the

7

primary lease term. Prairie also contends that under the lease, a cessation of production of less than 180 days would not terminate the lease, and since there has not been a cessation of production for longer than 180 days, Prairie is entitled to continue to operate the well.

¶22 In construing an oil and gas lease, courts generally apply the rules of contract interpretation. *Sandtana, Inc. v. Wallin Ranch Co.*, 2003 MT 329, ¶ 26, 318 Mont. 369, 80 P.3d 1224. In doing so, we have stated that the " 'intention of the parties is to be pursued if possible,' " and that this intention " 'is to be gathered from the entire agreement, not from particular words or phrases or disjointed or particular parts of it . . . . The contract must be viewed from beginning to end, and all its terms must pass in review; for one clause may modify, limit or illuminate the other.' " *Sandtana*, ¶ 26 (quoting *Federal Land Bank v. Texaco, Inc.*, 250 Mont. 471, 474, 820 P.2d 1269, 1271 (1991); *Lee v. Lee Gold Mining Co.*, 71 Mont. 592, 599, 230 P. 1091, 1093 (1924)).

> "It is well established that a court, in interpreting a written instrument, will not isolate certain phrases of that instrument in order to garner the intent of the parties, but will grasp the instrument by its four corners and in light of the entire instrument, ascertain the paramount and guiding intention of the parties."

*Sandtana*, ¶ 26 (quoting *Federal Land Bank*, 250 Mont. at 474-75, 820 P.2d at 1271; *Steen v. Rustad*, 132 Mont. 96, 102, 313 P.2d 1014, 1018 (1957)).

¶23 Because oil and gas leases deal with property of a highly speculative nature, "the protection of the interests of the lessor is considered of paramount importance." *Stanolind Oil & Gas Co. v. Guertzgen*, 100 F.2d 299, 300 (9th Cir. 1938). Thus, we construe oil and gas leases liberally in favor of the lessor and strictly against the lessee.

8

*Clawson v. Berklund*, 188 Mont. 48, 53, 610 P.2d 1168, 1171 (1980). And, while forfeitures are not favored in other areas of the law, forfeitures of oil and gas leases are favored "to prevent lands being burdened by profitless and unworked leases." *Fey v. A. A. Oil Corp.*, 129 Mont. 300, 316, 285 P.2d 578, 586 (1955); *see also Christian v. A. A. Oil Corp.*, 161 Mont. 420, 425, 506 P.2d 1369, 1372 (1973).

¶24 In this case, the Moermans contend that there was no oil production prior to December 1, 2010, thus the lease automatically terminated on that date. The Moermans also contend that assuming the lease did not terminate on December 1, 2010, it would have terminated by May 2011, because there was a cessation of production in paying quantities between December 2010, and May 2011. We have several problems with the Moermans' arguments.

¶25 First, regarding the Moermans' contention that the well did not produce oil prior to December 1, 2010, thereby terminating the lease, the Moermans have not provided any evidence to refute Prairie's contention that oil was produced prior to the December 1, 2010 deadline. Keith Carver, the petroleum engineer who worked the well for PB Oil and TOI, testified as follows:

> A. . . . At 11/29 we started the well up to make sure it would produce, and we left the well site early, shutting the well down because of a blizzard. And then we didn't go up there until after—into December and actually establish production with the well.
> Q. But you continued operations up to and through December 1st?
> A. Yes.

The Moermans interpret Carver's statement that they "established production" into December, to mean that no oil was produced on November 29, 2010, when Carver started

up the well. However, the District Court determined that Carver's statement meant that *some* oil was produced from the well on November 29, 2010. The inference drawn by the District Court is correct since "established production" implies starting up the pump and seeing it produce oil. In addition, Carver also testified that he was at the well site on December 1, 2010. His testimony that they "didn't go up there until after—into December and actually establish production with the well" could also be interpreted to mean that they established production on December 1, 2010, the last day of the primary term of the lease.

¶26 Second, contrary to the Moermans' contentions, the lease clearly states that the production of oil is not the only thing that will prevent the lease from terminating on December 1, 2010. Rather, the lease states that it "shall remain in force for a term ending December 1, 2010 and as long thereafter as oil or gas of whatsoever nature or kind is produced from said leased premises . . . *or drilling operations are continued* as hereinafter provided." (Emphasis added.) The lease goes on to state that "[i]f, at the expiration of the primary term of this lease, oil or gas is not being produced on the leased premises . . . *but Lessee is then engaged in drilling or re-working operations thereon, then this lease shall continue in force so long as operations are being continuously prosecuted on the leased premises . . . .* (Emphasis added.)

¶27 In this case, Carver was actively engaged in re-working operations at the well both before and after December 1, 2010. Carver moved a work-over rig to the site, engineered the well to produce, constructed a pad for the pump, installed the hardware and equipment necessary to produce oil at the site, and replaced the pumping unit. Carver

started the unit pumping on November 29, 2010, but was forced off the site by a blizzard. In addition, service records indicate that Carver plowed the well out on December 1, 2010, but he was precluded from getting to the site the next day due to the harsh weather. Carver successfully got to the site and produced the well again for a state inspector on December 9 and 10, 2010.

¶28 Third, the Moermans cite this Court's decision in *Somont I* for the proposition that "the cessation of production in paying quantities" will trigger the automatic termination of a lease. *See Somont I*, ¶ 26. Thus, they maintain that the cessation of production at Moerman 14-30 for the five months from December 2010, to May 2011, terminated their lease with Prairie.

¶29 We stated in *Somont I* that "once a plaintiff establishes that an oil and gas lease has halted production, the burden shifts to the defendant to prove that the cessation was temporary and not permanent. A temporary cessation in production will not trigger an automatic termination of the lease," but "[a] cessation in production will only be deemed temporary when it is caused by a sudden stoppage of the well or a mechanical breakdown of the equipment used in connection with the well, or the like." *Somont I*, ¶¶ 28, 33.

¶30 However, we also stated in *Somont I*, that this does not hold true in every case, but only "in *most* oil and gas leases *operating pursuant to the conditions of the secondary term*." *Somont I*, ¶ 26 (emphasis added). Under the terms of the lease at issue in this case, the secondary term allows for a cessation of production "from any cause" not just for "a sudden stoppage of the well or a mechanical breakdown," provided that the cessation of production is less than 180 days:

> If after the discovery of oil or gas on said land . . . the production thereof should cease *from any cause* after the primary term, *this lease shall not terminate if Lessee commences additional drilling or re-working operations within one hundred eighty (180) days from the date of cessation of production* or from date of completion of dry hole. [Emphasis added.]

¶31 We further held in *Somont I*, that "[t]he diligent lessee who takes immediate steps to rectify a sudden halt in production will not lose his or her investment" during such a temporary stoppage. *Somont I*, ¶ 32.

> "The test for determining whether there was sufficient production or whether the lessee was acting with reasonable diligence in producing and marketing the gas from the leased lands is the diligence which would be exercised by the ordinary prudent operator having regard to the interests of both lessor and lessee. This is a question of fact that will depend upon the facts and circumstances of each case."

*Somont I*, ¶ 27 (quoting *Christian*, 161 Mont. at 427-28, 506 P.2d at 1373).

¶32 In this case, Gleason testified that he had contracted with Shell Oil Corp. to purchase the oil from Moerman 14-30, but before the oil can be sold, he has to obtain a mineral title opinion to demonstrate that he has clear title to the oil. Gleason further testified that he began contacting attorneys to get a title opinion beginning in September 2010, but because of the growth of the Bakken oil fields in North Dakota, there is a significant backlog in the production of title opinions. Gleason also testified that once this legal hurdle is overcome and they can start selling the oil, the well should initially produce 17 to 20 barrels of oil per day which will stabilize at 12 to 14 barrels per day, and at $100 per barrel, that will be a profitable amount.

¶33 Based on the foregoing, we hold that the District Court correctly concluded that the parties' oil and gas leases to the Moerman 14-30 well remained in effect.

12

**Issue 2.**

¶34   *Whether the District Court was correct in awarding Prairie its attorney fees.*

¶35   The District Court awarded Prairie its attorney fees under § 82-1-202(1), MCA, because the Moermans failed to establish that the lease to the Moerman 14-30 well had been forfeited. Section 82-1-202(1), MCA, provides:

> If the lessee or assignee of a lease neglects or refuses to execute a release as provided by this part, the owner of the leased premises may sue in any court of competent jurisdiction to obtain the release, and in that action the owner may also recover from the lessee or the lessee's successor or assigns the sum of $100 as damages, all costs, together with reasonable attorney fees for preparing and prosecuting the suit, and any additional damages that the evidence in the case warrants. . . . *If in the action the plaintiff fails to establish the forfeiture of the lease, attorney fees must be allowed to the lessee or assignee of the lease.* Issues in regard to attorney fees must be determined in the same manner as other issues in those actions. [Emphasis added.]

¶36   As we indicated previously in this Opinion, we review a trial court's order granting or denying attorney fees and costs to determine whether the trial court abused its discretion. *Somont II,* ¶ 25 (citing *Gullett,* ¶ 12). Finding no abuse of discretion in this case, we hold that because the Moermans failed to establish that the leases in question in this case had been forfeited, Prairie's attorney fees in defending this action are recoverable under § 82-1-202, MCA.

¶37   In addition, in its response brief on appeal, Prairie requested that it be awarded its attorney fees incurred on appeal. The Moermans did not refute Prairie's argument regarding attorney fees on appeal as the Moermans declined to file a reply brief. Consequently, we conclude that pursuant to § 82-1-202, MCA, Prairie is also entitled to

13

its attorney fees on appeal, and we remand to the District Court for a determination of those fees.

¶38    Affirmed.

/S/ LAURIE McKINNON

We Concur:

/S/ MICHAEL E WHEAT
/S/ PATRICIA COTTER
/S/ BRIAN MORRIS
/S/ JIM RICE