2015 ND 287

**Nathaniel FLECK and Alma Bergmann as CoTrustees of the George J. Fleck Trust, Plaintiffs and Appellants**

v.

**MISSOURI RIVER ROYALTY CORPORATION, Exxon Mobile Corporation, and Mountain Pacific General Inc., Defendants and Appellees.**

No. 20150106.

Supreme Court of North Dakota.

Dec. 7, 2015.

Ariston E. Johnson (argued) and Dennis E. Johnson (appeared), Watford City, N.D., for plaintiffs and appellants.

Michael D. Schoepf (argued) and Lawrence Bender (on brief), Bismarck, N.D., for defendants and appellees Missouri River Royalty Corporation and Exxon Corporation.

Zachary E. Pelham (appeared), N.D., for defendant and appellee Mountain Pacific General, Inc.

CROTHERS, Justice.

[¶ 1] Nathaniel Fleck and Alma Bergmann as trustees of the George J. Fleck Trust ("Fleck") appeal from a summary judgment quieting title to an oil and gas lease in favor of Missouri River Royalty Corp., Exxon Mobil Corp. and Mountain Pacific General, Inc. (collectively "defendants"). We reverse and remand, concluding that the district court misapplied the law in interpreting the lease and that summary judgment was not appropriate.

I

[¶ 2] Fleck owns mineral interests in McKenzie County described as the south half of section 10 in range 100 west of township 150 north. In 1972, Fleck's predecessors in interest executed an oil and gas lease in favor of the defendants' predecessor in interest. The lease term was ten years and as long thereafter as oil or gas was produced. The lease also provided it would not expire if production ceased after expiration of the primary term if the lessee resumed operations to drill a well or to restore production within ninety days. In 1982, the Fleck 1 well was completed and the lease extended.

[¶ 3] On February 22, 2012, Fleck served the defendants with a notice of forfeiture and a demand for release of the lease. On September 6, 2012, Fleck sued the defendants to quiet title, alleging the oil and gas lease expired due to a failure to produce oil or gas in paying quantities. The defendants answered, counterclaimed and requested the court declare the lease remained valid and in effect by the continued production of oil and gas from the Fleck 1 well and by the commencement of operations to restore production.

[¶ 4] Fleck moved for summary judgment, arguing they were entitled to a declaration quieting title to the mineral interests because the lease terminated when the Fleck 1 well stopped producing in paying quantities in 2010 and the defendants failed to engage in new drilling or reworking operations within ninety days. Pacific Mountain General and Missouri River Royalty separately moved for summary judgment, arguing the lease extended into its secondary term and remains valid and in effect based on the continued production of oil and gas by the Fleck 1 well. Exxon Mobil joined Missouri River Royalty's motion.

[¶ 5] The district court granted the defendants' motions for summary judgment. The court interpreted the lease and found production in paying quantities was not required to extend the lease, the well consistently produced an average of a few barrels per day, production was continuous at all relevant times and any cessation of production was temporary. The court concluded:

"The Fleck Lease was thus extended into its secondary term and remains valid and in effect based on the continued production of oil and gas by the Fleck 1 well and by the commencement of operations to restore production from the Subject Lands within ninety (90) days of any temporary cessation of production and the continued prosecution of such operations until production was restored. Because any temporary cessation of production was timely restored and, therefore, did not lead to the cancellation of the Lease, the Fleck Lease remained in full force and effect at all relevant times."

Judgment was entered declaring the oil and gas lease is valid and in effect, and quieting title in favor of the defendants.

II

[¶ 6] Fleck argues the district court misapplied the law in interpreting the lease and erred in granting summary

judgment in favor of the defendants. This Court's standard for reviewing a summary judgment is well established:

"Summary judgment is a procedural device for the prompt resolution of a controversy on the merits without a trial if there are no genuine issues of material fact or inferences that can reasonably be drawn from undisputed facts, or if the only issues to be resolved are questions of law. A party moving for summary judgment has the burden of showing there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. In determining whether summary judgment was appropriately granted, we must view the evidence in the light most favorable to the party opposing the motion, and that party will be given the benefit of all favorable inferences which can reasonably be drawn from the record. On appeal, this Court decides whether the information available to the district court precluded the existence of a genuine issue of material fact and entitled the moving party to judgment as a matter of law. Whether the district court properly granted summary judgment is a question of law which we review de novo on the entire record."

*Johnson v. Shield,* 2015 ND 200, ¶ 6, 868 N.W.2d 368 (quoting *Hamilton v. Woll,* 2012 ND 238, ¶ 9, 823 N.W.2d 754).

### III

[¶ 7] Oil and gas leases are interpreted like other contractual agreements. *See Tank v. Citation Oil & Gas Corp.,* 2014 ND 123, ¶ 9, 848 N.W.2d 691. "The construction of a written contract to determine its legal effect is a question of law for the court to decide, and on appeal, this Court will independently examine and construe the contract to determine if the [district] court erred in its interpretation of it." *Id.* (quoting *Egeland v. Cont'l Res., Inc.,* 2000 ND 169, ¶ 10, 616 N.W.2d 861).

[¶ 8] In *Tank,* 2014 ND 123, ¶ 10, 848 N.W.2d 691, this Court explained how oil and gas leases are interpreted:

"Contracts, including oil and gas leases, are interpreted to give effect to the parties' mutual intent at the time of contracting. N.D.C.C. § 9–07–03. The parties' intent is ascertained from the writing alone if possible. N.D.C.C. § 9–07–04. 'The language of a contract is to govern its interpretation if the language is clear and explicit and does not involve an absurdity.' N.D.C.C. § 9–07–02. Words in a contract are construed in the ordinary and popular sense, unless the parties use the words in a technical sense or give the words special meaning. N.D.C.C. § 9–07–09; *Egeland,* 2000 ND 169, ¶ 10, 616 N.W.2d 861. Technical words are interpreted as usually understood by people in the profession or business to which they relate, unless they are clearly used in a different sense. N.D.C.C. § 9–07–10. 'A contract must be read and considered in its entirety so that all of its provisions are taken into consideration to determine the true intent of the parties.' *Egeland,* at ¶ 10; *see also* N.D.C.C. § 9–07–06. We attempt to give effect to every clause, sentence, and provision in a contract. *Rolla v. Tank,* 2013 ND 175, ¶ 7, 837 N.W.2d 907."

[¶ 9] The habendum clause states the lease remains in force for ten years and "as long thereafter as oil or gas, or either of them, is produced from said land by the lessee, its successors and assigns." The plain language of the lease states it will remain in effect after the primary term so long as oil or gas is produced.

[¶ 10] The parties do not dispute that the Fleck well produced oil or gas after the ten-year primary term expired and

that the lease extended into the secondary term. However, the parties dispute whether production was sufficient in recent years to hold the lease. The district court found the Fleck 1 well was consistently producing an average of a few barrels of oil per day and permanent cessation never occurred because the well produced some oil in all but a few months during the disputed period. The court concluded the lease remained valid and in effect based on the continued production of oil and gas. Fleck argues the district court erred in its interpretation because the lease requires production of oil or gas in paying quantities for the lease to remain in effect after the primary term and no evidence shows the well was producing in paying quantities after 2010.

▉ [¶ 11] The lease does not specifically define "production." However, "[t]echnical words are to be interpreted as usually understood by persons in the profession or business to which they relate, unless clearly used in a different sense." N.D.C.C. § 9-07-10. In construing oil and gas leases, "production" as used in a "so long thereafter" clause is "generally interpreted to mean 'production in paying quantities....' " *Tank,* 2014 ND 123, ¶ 12, 848 N.W.2d 691; *see also Sorum v. Schwartz,* 344 N.W.2d 73, 77 n. 2 (N.D. 1984) ("*Sorum I* "). "Absent a definition of the term in the lease, 'production' sufficient to keep a lease alive after the expiration of the primary term under the 'so long thereafter' clause is normally construed to mean production in paying quantities...." 8 Patrick H. Martin & Bruce M. Kramer, *Williams & Meyers Oil and Gas Law Manual of Terms* 816 (2014). Other courts have interpreted "produced" as used in a habendum or other clause related to extending a lease to mean "produced in paying quantities." *See, e.g., Gypsy Oil Co. v. Marsh,* 1926 OK 246, 121 Okla. 135,

248 P. 329, 333; *Garcia v. King,* 139 Tex. 578, 164 S.W.2d 509, 511–13 (1942); *Goodwin v. Wright,* 163 W.Va. 264, 255 S.E.2d 924, 925–26 (1979); *see also* 2 W.L. Summers, *Summers Oil and Gas* § 14:13, 241–43 (2006) (noting many courts have adopted this rule). Courts have adopted this interpretation because the objective of a lease is not merely to have oil or gas produced in some quantity but to obtain production that is commercially profitable to both parties, and because the parties did not intend the lessee to hold a lease after the expiration of the primary term for speculative purposes only. 3 Patrick H. Martin & Bruce M. Kramer, *Williams & Meyers Oil and Gas Law* § 604.5, 74–76 (2014). The term "production" used in the habendum clause in this case means "production in paying quantities."

[¶ 12] The district court did not conclude the lease required production in paying quantities, and the court did not determine whether the well was producing in paying quantities in deciding whether the lease terminated. We conclude the court misapplied the law and erred in interpreting the lease.

[¶ 13] The parties dispute whether the well was producing in paying quantities and whether the lease terminated. Fleck contends evidence shows the Fleck 1 well posted a net loss of over $200,000 from July 2010 through June 2013 and no evidence exists from which a fact finder could conclude the well was producing in paying quantities after 2010. The defendants contend a simple analysis of profits and losses of a single well over a select time period does not demonstrate whether a well is producing in paying quantities.

▉ [¶ 14] This Court has not specifically addressed how production in paying quantities should be determined. However, we have said production in paying quantities for purposes of keeping a lease

in force after expiration of the primary term generally means "production in quantities sufficient to yield a return in excess of operating costs, even though drilling and equipment costs may never be repaid and the undertaking considered as a whole may ultimately result in a loss." *Tank*, 2014 ND 123, ¶ 12, 848 N.W.2d 691 (quoting 8 Patrick H. Martin & Bruce M. Kramer, *Williams & Meyers Oil and Gas Law Manual of Terms* 816 (2013)). We also have indicated production in paying quantities is not determined by a simple analysis of profits and losses over a select period of time. "A reasonable time must be allowed for production in paying quantities in order to determine the average production of oil and gas, the cost of production, and the availability of markets." *Sorum v. Schwartz*, 411 N.W.2d 652, 654 (N.D.1987) ("*Sorum II*").

[¶ 15] Texas courts apply a two-step analysis to determine whether a well produces in paying quantities: 1) whether the well yields a profit exceeding operating costs over a reasonable period of time, and 2) whether a reasonably prudent operator would continue operating the well in the manner being operated for the purpose of making a profit and not merely for speculation. *See Clifton v. Koontz*, 160 Tex. 82, 325 S.W.2d 684, 690–91 (1959); *see also Cannon v. Sun–Key Oil Co., Inc.*, 117 S.W.3d 416, 421 (Tex.App.2003). The court must consider all matters influencing a reasonable and prudent operator, including:

> "The depletion of the reservoir and the price for which the lessee is able to sell his produce, the relative profitableness of other wells in the area, the operating and marketing costs of the lease, his net profit, the lease provisions, a reasonable period of time under the circumstances, and whether or not the lessee is holding

the lease merely for speculative purposes."

*Clifton*, at 691.

[¶ 16] Other courts use similar tests and consider relevant facts and circumstances in deciding whether a well was producing in paying quantities. *See, e.g., Texaco, Inc. v. Fox*, 228 Kan. 589, 618 P.2d 844, 848 (1980) (stating the production of a well should be considered over a sufficient period of time to reflect the current production status of a lease and to provide the information a prudent operator would take into account in deciding whether to continue the operation); *Mich. Wis. Pipeline Co. v. Mich. Nat'l Bank*, 118 Mich.App. 74, 324 N.W.2d 541, 545 (1982) (stating a lessor must establish that the lessee was not making a profit from the operation and that a reasonably prudent operator would not have continued to operate under similar circumstances); *Moerman v. Prairie Rose Res., Inc.*, 2013 MT 241, ¶¶ 31–32, 371 Mont. 338, 308 P.3d 75 (applying an ordinary prudent operator standard and considering the facts and circumstances of the case to determine if a lease remained in effect); *Smith v. Marshall Oil Corp.*, 2004 OK 10, ¶ 12, 85 P.3d 830 (stating the court considers the facts and circumstances of a cessation to determine whether a failure to produce in paying quantities is sufficient to terminate a lease); La. Stat. Ann. § 31:124 (2014) (defining production in paying quantities as production sufficient to induce a reasonably prudent operator to continue production in an effort to secure return on investment or to minimize loss); *see also* 3 Patrick H. Martin & Bruce M. Kramer, *Williams & Meyer Oil and Gas Law* § 604.5, 77 (2014); 38 Am. Jur. 2d *Gas and Oil* § 214.

[¶ 17] This Court has never expressly defined what test should be used to determine whether a well is producing in paying quantities but, like these other

courts, we have indicated the facts and circumstances should be considered. This Court held a reasonable time must be used to determine whether a well was producing in paying quantities. *See Sorum II*, 411 N.W.2d at 654. We have held the surrounding circumstances must be considered in deciding whether a lease automatically terminated, and the decision must be made in light of the particular fact situation with due consideration for the lessor's and lessee's legitimate interests. *Feland v. Placid Oil Co.*, 171 N.W.2d 829, 835 (N.D.1969). This Court held that a lessee has an implied obligation to the lessor to do everything that a reasonable and prudent operator would do in operating, developing and protecting the property with due regard for both the lessor's and the lessee's interests. *Olson v. Schwartz*, 345 N.W.2d 33, 38–39 (N.D.1984). Our decisions indicate the district court must consider the facts and circumstances over a reasonable period of time to determine if a well is producing in paying quantities or whether production has ceased.

[¶ 18] We agree with the rationale used by Texas and other courts to determine whether a well is producing in paying quantities. A court must consider whether the well yielded a profit over operating costs over a reasonable period of time and whether a reasonable and prudent operator would continue to operate a well in the manner in which the well was operated under the relevant facts and circumstances. Whether the Fleck well was producing in paying quantities during the relevant period is a genuine issue of material fact. We conclude summary judgment was not appropriate.

[¶ 19] Although the district court did not interpret the lease to require production in paying quantities to extend the lease in the secondary term, the court ruled that even if production ceased, the lease remained valid and in effect under the savings clause by the commencement of operations to restore production within ninety days of any cessation. The court concluded production in paying quantities was not required to extend the lease under the savings clause. The court found the lessee performed work on the well or took measures to evaluate whether operations would return the well to profitability whenever production stagnated. The court found evidence established any cessation of production was temporary and procedures were undertaken to restore production.

[¶ 20] The lease savings clause provides:

> "If, after the expiration of the primary term hereof, production shall cease from any cause, this lease shall not terminate if lessee resumes operations for the drilling of a well or restoration of production within ninety (90) days from such cessation, and this lease shall remain in force and effect during the prosecution of such operations and, if production results therefrom, then as long thereafter as such production continues."

For the same reasons we interpreted "production" in the habendum clause as requiring "production in paying quantities," "production" in the savings clause must be interpreted in the same manner.

[¶ 21] Under plain language of the lease, if production in paying quantities ceases after the primary term expires, the lease will not terminate if the lessee resumes operations to drill a well or to restore production within ninety days of cessation. The lessee is not required to restore production in paying quantities within ninety days, but is required to begin operations to drill a well or to restore production to paying quantities. The lease will remain in force and effect during the prosecution of the operations to

drill a new well or to restore production and, if production results, then as long as production continues in paying quantities. The district court erred in interpreting the savings clause.

[¶ 22] We conclude the district court erred in interpreting the lease and misapplied the law. We also conclude genuine issues of material fact exist and summary judgment is not appropriate. We reverse and remand.

### IV

[¶ 23] We reverse the district court's summary judgment and remand for further proceedings.

[¶ 24] DALE V. SANDSTROM, ACTING C.J., LISA FAIR McEVERS, JJ., BENNY A. GRAFF, S.J., MARY MUEHLEN MARING, S.J., concur.

[¶ 25] The Honorable BENNY A. GRAFF, S.J. and the Honorable MARY MUEHLEN MARING, S.J., sitting in place of VANDE WALLE, C.J. and KAPSNER, J., disqualified.